We have five cases this morning and the first one is Bastien v. Attorney General No. 13-3019, Ms. Coyle and Ms. Clay. Whenever you're ready. Good morning, Your Honors. Can you hear me, Judge?  Thank you. My name is Ann Coyle and I am with the firm of Gibson, Dunn & Crutcher. We represent Petitioner Mr. Bastien pro bono. Thank you. Your Honors, this case is not a challenge to any factual determination made by the agency. Rather, our fundamental argument is that the agency erred in ignoring key pieces of evidence and that that was an error of law. And in making these determinations, ultimately the overall decision was infected with these errors. And there were several key things that were not addressed at all. Isn't that basically asking us to reconsider the evidence that was found by the hearing officials? Your Honor, we're not asking to reconsider the evidence. We're asking that the agency be required to consider all relevant evidence as the CAT regulations require all evidence of torture to be considered. Is that considered because the hearing officials didn't comment on the evidence or because evidence was excluded that should be considered? We're not arguing that anything had been excluded below, but there was no comment at all or any analysis of several key pieces of evidence which has been found to be error in this context. First, there was no mention at all of a key piece of evidence that was introduced at the second hearing, which was the declaration by Max Bastien. I ask the question because this goes to the court's jurisdiction, and I want to pointedly ask you because a hearing official or a judge does not make a specific comment with regard to evidence, does that mean that it's not being considered? Does a hearing officer or an integration officer have to comment on every piece of evidence? Well, Your Honor, I think there's a requirement that every significant positive piece of evidence does need to be analyzed because if it is not, then how would this court know whether it had been considered or not? Well, let me ask you just at the outset. I mean, since the briefing was filed, we've had the death of Jean-Claude Duvalier, or so-called Baby Doc, who had been realized until I read his obituary that he has been living in Haiti from 2011 to now. Does that have any effect on this case? You know, Your Honor, that's a very interesting question, and I thought about it a little bit as well when I read about his death. I mean, it's outside of the record for the case to be remanded. I think it would be appropriate to consider that. But my understanding, and what was submitted below, was an expert declaration which testified to the continuing political turmoil in Haiti. There are factions of people who hate the Duvaliers, including people in the Haitian military police, and even though Baby Doc was able to live in Haiti his last years, I'm sure he was well protected by security. So I don't think that really goes directly to the issue of whether one particular person who's incarcerated and detained in an environment where the police, as many of them, do have animosity for his family associations. I don't know that that would directly answer that question. And also, just in looking at this at the outset, one of the – your blink response is when you have this many members of either the Bastien or the Lacroix – his mother's side was Lacroix, is that right? Yes. Families, killed six people. You sit and take notice. And yet, this particular person, client, went back in 1988 and 1995 without incident. Yes, we recognize that, Your Honor. I don't think that is necessarily a per se borrow on a finding that he would be endangered there. But, again, the context is very different where he would be processed by the Haitian authorities. They would know he was there. He has no freedom of movement to try to keep himself safe. And as we addressed in our brief, there were extenuating circumstances when he went back in 1995. It was to help search for his missing brother who had been abducted. So his willingness to take that personal risk isn't necessarily reflective of a lack of danger. People coming in and out of the country are themselves processed, aren't they? He must have been aware that when he gets into Port-au-Prince or wherever he goes to, that he's going to be checked, his name is going to be checked. If there are, let's say, corrupt police officials that are going to turn him over, they certainly could have done it when he went back to Haiti on those two occasions. It's not impossible that that could have happened, but it didn't happen. And the fact that it didn't happen once doesn't mean that if he weren't held for some period of time, that there would be greater access to him for retaliation and targeting. How about the possibility that these are random acts of violence as opposed to individuals targeting members of the Duvalier family or people who were with him? Anything is possible. It seems that the number and the brutality of the acts of violence all against one family, when placed in the context of the testimony of someone who was there, did have personal knowledge. Max Fashion, he said he fled Haiti when there were violent reprisals, including hacking people with machetes. One of the victims in this case was slashed with a machete. And we recognize it's very difficult to show motive under these circumstances, and that has not been a requirement that there be some sort of documentary evidence to show that. So it's really a question of the overall context in which this arose. And there was also a State Department report that was introduced at the original hearing, which was contemporaneous with some of these acts, which stated that people who were known affiliates of the Duvaliers were treated differently in the detention when they were put in detention after being repatriated. So there was actually outside corroborating evidence of this problem, and that was one piece of evidence which was not addressed in either the IJ's or the BIA's decision, and we would respectfully argue that that was clear error of law. Is your argument essentially it's that, not that you're challenging prison conditions, but that this person would be singled out for persecution because of his family connections? That is exactly the argument, and we put forward that opinion in our expert report. And, Your Honors, I neglected to mention I wanted to reserve rebuttal time. No problem. May I do so? Thank you. Thank you very much. Ms. Clay. Good morning, Your Honors. My name is Sharon Clay. I'm here on behalf of the government. Can you hear me? Could you please pull the microphone a little bit closer to you? Your voice is very soft. My apologies. Thank you. May it please the Court, my name is Sharon Clay on behalf of the government. Do you have any perception or view as to what the recent death of Jean-Claude Duvalier has with regard to this matter? I would say that the recent death, the fact that he's been able to reside in Haiti for the last two years without harm would suggest that persons who are part of the Duvalier regime are not targeted for harm or persecution. How do you explain what happened in this particular case? I mean, it's like anybody who was associated, especially with Mr. Bastien's mother's side of the family, is in deep trouble. Yes, we do understand it's a subjective fear, the family in terms of fear. However, the petitioners as well as the expert witness only speculated as to who the potential persecutors were. Well, Duvalier wasn't living in an open-gated community, was he? I mean, he was probably protected while he was in Haiti. In light of the violence and threats against his life. Well, without that evidence, it's kind of hard to know for certain whether or not he's protected. The fact that he was willing to return back to Haiti is suggestive of his fear of potential harm as well. I'm not sure, I don't think it would be appropriate to assume that he felt that he could go back because he was going to be adequately fortified. I think that a reasonable interpretation of his return back to Haiti is that he didn't fear any proposals or harm at the time. Do you discount this assertion that there are people in Haiti who have absolutely hated Duvalier and all the people that worked for him and have killed people who worked for him and there have been assaults on people who were employees of his government? There very well is likely people who are there who are anti-Duvalierists. However, the facts as presented in this particular case suggest it's based on speculation and hearsay. All of the members of the family who testified each got before the immigration judge and said that they had no idea who attacked their family members. Without evidence of the identity or motives of the attackers for their family members. I understand the specifics of this case, but generally in Haiti, were there not people who sought vengeance against Duvalier because of the type of reign that he exercised in Haiti? That's true, but the petitioner I mean, there are country reports, don't they? The country reports actually belie that account. This quote refers to a 2003 or previous account, but the most recent country report for 2009 actually said that there's no political detainees. There's been no record of political disappearances or killings. In this case, you've got six deaths in nine years. The most recent one is in 2004. Petitioner appealed, or this last case was heard before the immigration judge in 2011, which is six years remote. We don't know if anything's happened, whether family members have continued to stay there. In fact, one of the family members does still continually reside in Haiti and has not been harmed. It was Ms. LaCroix's husband, I believe, who was a judge during the Duvalier repression. He still resides in Haiti, and he's been unharmed. The big problem I have with this case from your perspective is that it looks like the IJ and also the BIA talked about the prison conditions, and that's not what was argued. I mean, and also we've decided that in an en banc case, in fact, dealing with Haiti. But here it was perceived support for the Duvalier regime and for his perceived wealth that he would be singled out and persecuted. And I don't know if he wins or not, but shouldn't they at least deal with the right issue? I do believe that they dealt with the right issue. I mean, they cited the law as it was supposed to be stated, and they just determined that. Well, okay. Show me where they dealt with that issue. I don't have the board in terms of the misstatement of the law regarding the willful blindness. That's willful blindness to prison conditions, isn't it not? Or is it willful? I mean, where is the say willful blindness or anything else pertaining to the family connections and the perceived wealth? Well, the immigration judge pointed to the fact that there was no identity, there was no motive, there was speculation, there was no close relationship with the family. Petitioner has not been in Haiti for the last 23, 25 years. He's been back to Haiti only one time in that period of time. But what I'm talking about is when they state what the issue is, what did the I.J. state what the issue was in terms of both the withholding of removal and CAT claims? Whether or not it was more than likely that he was going to be tortured or persecuted upon his return to Haiti. Because? Because of his family ties. Is that what the I.J. said? In my opinion, I believe so, yes. But even assuming that immigration did not reach that issue, getting back to the question of jurisdiction, the issue of whether or not the prediction of a future likelihood of persecution or torture actually takes place is a factual determination. What I'm looking for is where in the BIA or I.J. decisions did either of them consider Bastien's claim that he would be singled out for torture in prison because of his perceived political beliefs and family connections? They couldn't evaluate that, or they couldn't meaningfully evaluate it, because they had no factual evidence to support his connection to his family or an imputed political opinion. Mr. Bastien admitted that he had no political opinion. And like I said, he left Haiti at the age of seven. So there's sort of a tenuous how do you establish that you have this kind of imputed political opinion? But most people know who his father was, correct? I'm not sure it's that clear that everybody knows. I mean, there's people that do know. But even when the expert came forward, she had to do an independent research on Max Bastien. It wasn't that she testified, I'm clearly aware of him, even in her regular travels through Haiti. It was her testimony that she had an interview with Max Bastien and his father and then went out to investigate the prominence of Max Bastien. It wasn't that she was immediately aware of it. Could you comment on this? I think this is part of Ms. Coyle's argument that the immigration judge focused on conditions in Haitian jails and seemed to ignore Mr. Bastien's argument that he would be targeted in Haiti prisons because of his family's association with Duvalier, not necessarily prison or jail conditions. Yes, because the evidence and the precedence for substandard prison conditions is established. The problem with this case is that there hasn't been anything established in terms of who his persecutors are. If I may, if I was to do any analysis on whether or not anti-Duvalier was going to hurt him, he hasn't established at this point that that is the basis that he would be targeted for harm. So it's not enough that anti-Duvaliers are targeted for being attacked. He needs to show that he's more likely to be targeted because they can acknowledge or recognize his connection to the regime. And having been in the United States for 23 years, it's not readily or immediately. Didn't he have the same name as his father or was a judge appointed by Duvalier? Yes, but he did have the same name, but the immigration judge only gave that minimum weight to the extent that most persons find it more easy to make family connections when there is a common first name. But in this particular case, the people that have been harmed that the petitioner is relying on to establish his family ties do not have the same last name. And like any one of us who has friends or neighbors in the area may not readily know who our family members are simply because that person doesn't have the same last name. So that's sort of why the immigration judge gave it a little less weight. Can I go back to the country report, which I have not seen, but I imagine you have had a chance to look at it. Is there a finding that there's anti-Duvalier sentiment that still exists in Haiti? Not in the most recent country reports. What is the year? The expert testimony, she actually testifies to this anti-Duvalier. This was brought up in the hearing, was it?  However, the immigration judge, when considering the expert witness' testimony about the Duvaliers and the harm that they received of targeting, the immigration judge actually minimized the expert witness' testimony because she's an interested party. She actually serves as an advocate for Haitian criminal deportees. A lot of her background is not specifically about Max Bastion, but about criminal deportees in general. She also testified during her, before the hearing, that based on her conclusions, which she relied on communications with Mr. Bastion and his father, she also indicated that she did not base her conclusions on his threat of harm, on the records on criminal deportees because she indicated that the records were incomplete and confusing. One of the other issues that was raised that minimized expert witness' testimony was the fact that she did not conduct an independent verification of circumstances surrounding the deaths of his family members. So no one knows within any certainty, there's no other evidence as to anything that the attacker said, why his family members were attacked. And at this point, it appears that the whole claim is based on speculation and hearsay. This sort of notion that because we're all family and we're all dead is the reason because we're all family is not supported by any substantial evidence. It's pretty telling, though, that five members of the same family end up meeting with a very violent death within a period of nine years. There's a lot of people that meet a very violent death in Haiti. The country reports also show that there's issues with ongoing civil unrest between different political factions, not just the anti-Jubilees in the area. There's also vigilantism where some of the Haitians themselves, because in some areas where they don't have adequate support from the police, they have taken justice into their own hands, so to speak. But a lot of these types of things are based on the community report or the country reports. It's not based on the participation in the regime. These are things like witchcraft and that there were lynchings because of theft and some of these other types of things. I just have one more question for you. Do you know what his current status is? No, I do not. Well, he's a criminal deportee. I mean, he's a criminal alien. Is he in detention at the moment? I don't think so. I'm not sure. He's not currently detained. Thank you very much. Dick, do you have any questions? No, no, you've asked all the right ones. Okay, I just want to close by saying because Mr. Basham was found removable for having committed an aggravated felony, this Court should dismiss the petition for review to the extent that Mr. Basham challenges the weighing of the evidence and the agency's factual determination that he failed to establish a clear probability of persecution or torture pursuant to Kaplan. Any alternative, this Court should deny this petition for substantial record evidence or divorce finding that Mr. Basham failed to establish a clear probability of persecution or torture. Thank you very much. Your Honor, just briefly, I'll clarify my prior statement as I wasn't sure if the question was addressed to whether Mr. Basham was currently detained in the United States or in Hades. Currently in the United States, he's not been deported and he's not detained. Going back to Your Honor's question about the failure of the agency to engage the claim that Mr. Basham would be subjected to torture specifically because of his family connections, that is our argument that that was one of the key errors that was addressed because ---- How is it an error, though? I thought the immigration judge did address that. Your point is that the immigration judge ignored that completely. My point is that the immigration judge didn't actually engage the specific intent inquiry. He stated that prison conditions, while deplorable, did not rise to the level of torture in accordance with the circuit's prior holdings, but he did not engage in an analysis of whether there was sufficient evidence to show that Mr. Basham would be specifically targeted. And in so doing, he did not acknowledge the Carson Report's statements about this subject. And while my adversary just pointed out the government's position with respect to various issues in the court, the immigration judge actually didn't make any of those findings. The immigration judge merely said that the court would give her limited weight, but did not address at all any of the statements concerning the history of attacks on Duvalieris or her opinion that Mr. Basham would be targeted in prison as a result of his family associations. And the BIA did not address that issue at all as well. The agency also, the immigration judge also erred in stating that Mr. Basham's lack of demonstrated political opinion was relevant to the analysis, because our argument is imputed political opinion, and you don't need to be shown to hold an opinion to be associated with those, and especially in a case like this where you're the son of someone who was known to be a member of a family association. You don't need to be shown to hold an opinion to be associated with the despised regime. So the purported misstating of the issue relates primarily to the CAC claim, does it not, as opposed to the withholding of removal claim? It does relate to the CAC claim, Your Honor, but I would also point out that the immigration judge didn't consider the Carson Report in the context of the withholding claim, and he actually said that with respect to the application. I think what the IJ said was that the Carson was an expert witness always on behalf of one side and therefore came with, quote, an agenda, close quote. That's correct, he did say that, but he specifically confined his analysis of the Carson Report to the CAC claims and didn't actually address it in the context of the persecution claims. Could you comment on the judge's comment on the expert testimony? He said that she, putting aside the fact that she's a paid witness, because most witnesses do get paid for testimony, that's fine, but that she had an agenda because she was allied with an immigrant group. Yes, the judge did accord her limited weight based on this purported misstatement and agenda, which relates to her having represented other respondents in similar situations arguing about conditions in Haitian prisons, but to my knowledge there was no evidence that there was any prior testimony relating to the Duvalier situation. So this was one area in which she was not known for having testified before. And this Court has credited Ms. Carson in the past in the Levera case because she has extensive experience in Haiti. And at the bottom the immigration judge didn't say her opinion was entitled to no weight, but then just went on and disregarded it. Do you think that anti-Duvalier sentiment has receded quite a bit in Haiti? Your Honor, it's hard to answer that question not having gone to Haiti or being an expert in Haitian politics. What part of the country? I acknowledge that it is not noted in the 2009 country report. It seems that there is extreme political instability there and blood feuds that may last a very long time, and even though it sounds like a long time ago, 1986, as noted as late as 2001, the country report did have a statement that people were treated differently in detention. Unless Your Honors have any additional questions. Thank you very much.